Our next case for argument this morning is Patterson v. Song. I see Mr. Schultz and Ms. Tate. Can you hear me? Yes, Your Honor. All right. You may proceed, Mr. Schultz. Thank you, Your Honor. May it please the Court, Barry Schultz, on behalf of the appellant, Laura Harris Patterson. I would like to read what I consider to be the most critical sentence in the ALJ's decision concerning the claimant's neurogenic bladder condition. On page 44 of the appellant's appendix, the last paragraph, the ALJ says, quote, The undersigned considered the claimant's testimony at the hearing that she needed to use a bathroom 10 or 15 times each day, but finds that this would not significantly interfere with her ability to perform sustained work activity, close quote. Well, the ALJ actually is finding that the claimant would have to use the bathroom that number of times, but that it wouldn't be work-preclusive. There are two problems with that finding. First, the vocational expert clearly said that 10 unscheduled bathroom breaks during a workday would, in fact, be work-preclusive. Secondly, the ALJ goes on to talk about how, well, the claimant might be able to take some of those breaks on her regular work breaks, but also some of them would occur outside of the workday. But that's a mistake of fact. The ALJ mistakenly found that the claimant would need 10 or 15 breaks for an entire day or for some period of time that's not actually clear in the decision, where it's clear that the claimant testified that those 10 or 15 breaks would occur during the workday. In fact, it was the ALJ who questioned the claimant very clearly and asked her to consider a period from 9 in the morning until 5 in the afternoon, how often would she need to use the restroom, and the claimant said 10 or 15 times for 2 to 10 minutes at a time. There's no other place in the record where that number of 10 or 15 bathroom breaks comes up. So it was only from the claimant's testimony the ALJ made a mistake of fact. The court can't tell how the ALJ would have ruled had the ALJ not made this mistake of fact. She may well have found that, well, according to the vocational expert, this number of breaks is work-preclusive, and therefore found the plaintiff disabled. The commissioner cites to a couple of other findings by the ALJ concerning the neurogenic bladder, but actually those findings aren't relevant as to this point because they don't undermine the fact that the ALJ finds the claimant, credits the claimant's testimony, but just makes a mistake of fact. But in addition, the ALJ mentioned a couple of times when the claimant denied bladder problems or urinary frequency problems, but one of those times to Dr. McNulty was prior to brain surgery, the craniotomy, which seems to be the cause of her neurogenic bladder. Two of the objective tests, the CAT scan and the ultrasound, were also prior to the craniotomy, so they wouldn't be relevant to the frequency of her need to use the restroom following that surgery. In addition, the claimant actually did complain to Dr. McNulty about urinary frequency, and we know that because there is a, page 1338 of the record, there is a report from a physical therapist, Ashley Johnson, from October of 2015, where Ms. Johnson was giving physical therapy to the plaintiff specifically for her neurogenic bladder problems. She was getting physical therapy for her pelvic floor weakness, and the claimant indicating to Ms. Johnson that she frequently had to use the restroom. Mr. Maliza, one of the administrative law judge's observations is that your client said to some physicians that she had urinary problems and to other physicians that she did not. Why isn't that itself enough to support, to provide substantial evidence for the decision? Because as I noted, other than one doctor, which I'll get to in a minute, all the other references were prior to the craniotomy surgery, which caused this severe increase in the frequency of urination. The only other doctor to whom the claimant allegedly denied urinary frequency was Dr. Reinicke, who was a podiatrist. The claimant went to see him for a severe ingrown toenail, and he only examined her left foot. And only in the review of systems, the doctor says that the claimant denied, and then lists 20 different things. So it's possible she filled out a form. It's unlikely the podiatrist asked her about her breathing problems and all of that. Maybe she filled out one of those forms you get when you go to a doctor's office, and she just denied everything other than her foot problems. But that was to a podiatrist. And additionally, a month after she made that statement, or allegedly made that statement to the podiatrist, she went to Dr. McNulty specifically for her urinary frequency problem, and he referred her to the physical therapist, Ms. Johnson, where she got specific treatment for her urinary frequency problem. So I would argue that that one statement to Dr. Reinicke is not substantial evidence supporting the ALJ's decision. And especially in light of the fact that Dr. Kavagia and Dr. Neff, both urologists, the only specialists in the record, treated the claimant specifically for this condition, with Dr. Kavagia saying that her symptoms are classical for post-craniotomy surgery for tumor removal. The other issue I would like to touch on is the fact that the ALJ adopted the residual functional capacity of the state agency doctor, Dr. Korshidi. But there was significant evidence that Dr. Korshidi was unaware of. And as this court has held on numerous occasions, where the claimant submits evidence of significant new problems or deterioration in existing problems, the ALJ should not be evaluating that objective evidence herself, because she's not qualified to do that, and should submit that evidence for medical review. In this case, we have, in particular, the left shoulder, where the claimant's left shoulder condition deteriorated. She underwent surgery after Dr. Korshidi reviewed the record. And Dr. Angeline, who was treating the claimant for this condition, at page 980, I believe, of the record, gave the claimant permanent restrictions based on her left shoulder condition of lifting no more than 15 pounds from the floor to her chest, and no more than 5 pounds above the chest level. The ALJ mentions Dr. Angeline's opinion, but states that the opinion was there were only temporary restrictions following the surgery. And while initially they were temporary restrictions, Dr. Angeline made those restrictions permanent. The ALJ doesn't mention that, doesn't explain how, given those permanent restrictions, Dr. Korshidi's opinion was still viable, and that the ALJ could rely on it. In addition, the claimant had a new lumbar spine impairment, which was severe and complex. As we cite at page 17 of the reply brief, we quote the MRI as very complex findings, which would require medical review to understand how they would impact someone with Ms. Harris-Patterson's additional impairments. On these basis, plaintiffs request that this court reverse the decision of the commissioner. Thank you, Your Honors. Thank you. Ms. Tate. Good morning, I'm Christy Tate on behalf of the agency. In this case, the ALJ was not required to accept all of the allegations put forth by Ms. Harris-Patterson during her testimony, especially where, as here, the allegations were not supported by the record. The only link between Ms. Harris-Patterson's allegations that she had to use the restroom between 10 and 15 times each visit for 2 to 10 minutes during the workday is her testimony. There is no other record support for this. There is diagnosis and there is treatment, but there's no evidence that it was as severe as she claimed. And what we know from the ALJ's decision, two points on the neurogenic bladder issue. First, the ALJ found that this was not a severe impairment. She went on to discuss the condition when discussing the residual functional capacity or the most that Ms. Harris-Patterson could do despite her limitations and her impairments. What the ALJ said is exactly what she was supposed to do. She considered that testimony. And what we know from the record in which the ALJ questioned her on this, the first thing Ms. Harris-Patterson said was, I'm in the bathroom 24 hours a day. And the ALJ followed up and said, we don't really mean that. What does this really look like? And then she went on to say, I go about 10 to 12 times a day for 2 to 10 minutes each. And the ALJ drilled down and it was her testimony that this would occur during the workday. But the decision does not show that the ALJ accepted that. Moreover, we know that the ALJ expressed throughout her opinion some skepticism of some of the remarks that Ms. Harris-Patterson made about her condition. And yes, in following her craniotomy, she did purport to tell, she did tell a podiatrist who, what the record shows is that she was asked about bowel and bladder and incontinence issues and she denied them all. And that was after the craniotomy. And that's one more piece of evidence. There's other instances in the record that caused the ALJ to be skeptical. We know this because the ALJ described it. She told her doctors in September of 2015, she said, I have no issues. I'm in good general health. She was at times not compliant with all of the treatment recommendations. We have statements of her healthcare providers, primarily her family physician, Dr. McNulty, was testing her for her alleged numbness and tingling in her hand. There were very little positive signs. And he remarked in the record that she tested positive for anything he asked her for. She also, in 2017, in September of 2017, this is post-surgery. This is with the physical therapist, Alderman. And it was clear from Ms. Alderman's note that Ms. Harris-Patterson was not putting forth her full effort. All of this creates a cloud of skepticism over the testimony from Ms. Harris-Patterson. And the hyperbolic initial statement at the hearing also is evidence in support of the ALJ's, heard her testimony, understood her version of events, but did not have to accept it. He had to, he had to, the ALJ had to consider it, but did not have to accept it. As for the second issue that is raised by Mr. Schultz, Dr. Korshidi submitted a medical opinion in March of 2016. Following that opinion, there was what Mr. Schultz mentioned was there was a MRI in May of 2016. Ms. Harris-Patterson claims that that was decisive, significant medical evidence that triggered the ALJ's responsibility to call another expert. That is not the case. What that MRI showed was minimal impingement, mild bulging. These were minimal results. Beyond that, what we know from subsequent physical therapy records and general physical examinations, Ms. Harris-Patterson, she had some tenderness along her cervical, not even her lumbar spine. She had some tenderness in an examination in September of 2017. No lumbar issues. Moreover, she had full strength, normal gait, normal sensation, and full range of motion. And that happened again in subsequent records in 2018. So the notion that this later submitted evidence was so significant it triggered a responsibility to get additional expert testimony, that's not borne out by the records and her physical condition. Moreover, her own treating surgeon, Dr. Angeline, cleared her for medium work. And I heard the argument from Ms. Harris-Patterson that the restrictions were temporary for the lifting. But in the most recent statement from Dr. Angeline says she's cleared for medium work. Medium work means she can lift. The lifting restrictions were at the medium level, which is actually lighter and less burdensome than the RFC that the ALJ created in the residual functional capacity finding that was backed up by Dr. Korshidi. And that is substantial evidence in this case. And just to close, substantial evidence, of course, is a deferential standard. It's such relevant evidence as a reasonable mind could accept as adequate to support a conclusion. Here the ALJ had numerous objective evidence. We have a stress test that she was cleared to do work that she could exercise at the level of an average woman her age. We have her cleared by her surgeon. After all of her surgeries for medium level work. And the ALJ was entitled to rely on all of that evidence and remain skeptical of her statements that are in the record. And with that, we will rest on our briefs if there are no questions. All right. Thank you very much, Mr. Schultz. First, the commissioner misstates Dr. Angeline's findings at page 980 of the administrative record. He used the term medium work, but, you know, that clarification isn't what's critical. He made specific findings as to her lifting limits, which are inconsistent with Social Security's definition of medium work. And, in fact, are less than Social Security's definition of light for light work. In addition, he said for other restrictions, refer to the functional capacity examination. That was Ms. Alderman's, I believe, evaluation. And at page 1198 of the record, Ms. Alderman's report actually says the claimant can only stand occasionally. Which, again, is incompatible with light work. That she can only reach in front of her occasionally. So Dr. Angeline, referring to this report, made significant findings which are incompatible. The only other thing I would say is that while one Dr. McNulty said she does complain of anything she tests positive for, this claimant had brain surgery, seven-foot surgeries, shoulder surgeries, both shoulders, significant degenerative disc disease in the lumbar spine and in the cervical spine, and she had fibromyalgia. Thank you, Your Honors. All right. Thank you very much. Your Honor, thanks to both counsel, the case is taken under advice.